# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**RACHEL HOWARD, as Executrix of the**
**Estate of C.R. Howard, deceased**                                              **PLAINTIFF**

**v.**                              **Case No. 4:16-cv-00687-KGB**

**USA**                                                                          **DEFENDANT**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came before the Court for a bench trial.[1]  Plaintiff Rachel Howard ("Ms. Howard"), executrix of the estate of C.R. Howard, was represented by counsel, and defendant the United States of America (the "Government") was represented by counsel.  Ms. Howard's claims result from the tragic death of her husband, Mr. Howard.  Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following specific findings and conclusions.  The Court determines that Ms. Howard has not sustained her burden of proof; she is not entitled to the relief she seeks.

### I.    Factual Background

1.    Ms. Howard, executrix of the estate of C.R. Howard, brings this action against the Government pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et. seq.*  This action is prosecuted in substance under the Arkansas Medical Malpractice Act, Ark. Code Ann. § 16-114-201, *et seq.*, and the Arkansas Wrongful Death Act, Ark. Code Ann. § 16-62-102.  Ms. Howard brings the lawsuit for the death of Mr. Howard and seeks damages resulting from the

---

[1]  Prior to the bench trial, the Government filed a motion *in limine* regarding a prior "Statement Under Oath" of Ms. Howard (Dkt. No. 47).  Ms. Howard did not offer that document into evidence at the bench trial.  Therefore, the Court denies the Government's motion *in limine* as moot (Dkt. No. 47).

alleged negligence of nurses and hospital staff at the John L. McClellan Memorial Hospital ("Hospital") in Little Rock, Arkansas.

2.      By prior Order, this Court addressed the scope of Ms. Howard's permissible claims against "staff employees/nurses" of the Hospital under the FTCA (Dkt. No. 57).

### A.     Mr. Howard's History

3.      Mr. Howard was born on January 22, 1940.  Def.'s Trial Ex. 1A.

4.      Mr. Howard married Ms. Howard January 9, 2009; it was not the first marriage for either of them.

5.      Ms. Howard is step mother to Teresa Howard Brooks ("Teresa Howard") and Russell Howard, Sr., Mr. Howard's children.

6.      Prior to retirement, Ms. Howard worked as a Registered Nurse.

7.      Mr. Howard was diagnosed with multiple myeloma in 2011.  Multiple myeloma is a cancer that develops from plasma cells.  Multiple myeloma is an incurable type of cancer, but treatments exist to prolong and improve the quality of life for the multiple myeloma patient.

8.      Mr. Howard was collecting disability benefits from the Veteran's Administration because he was 100% disabled as a result of multiple myeloma as of January 31, 2012.

9.      Even before that, Mr. Howard received some disability benefits from the Veteran's Administration due to epilepsy.  Mr. Howard had a seizure disorder for which he took medication.

10.     In 2013, medical records indicate that Mr. Howard had imaging done of his spine. He had certain pre-existing conditions related to his spine and vertebrae.

11.     In May 2014, Mr. Howard began receiving treatment for multiple myeloma from Zhifu Xiang, M.D., a hematologist with the Hospital.

12.     On January 27, 2015, Dr. Xiang started a new round of treatment on Mr. Howard and informed Mr. Howard and his family that Mr. Howard had two good years, according to the testimony of Teresa Howard.

13.     On February 10, 2015, Mr. Howard was on his fifth round of therapy for multiple myeloma.  On that day, Mr. Howard received a blood transfusion.  Def.'s Trial Ex. 1A, at 880. After the transfusion, Dr. Xiang instructed Mr. Howard's family to take him to a local emergency room if Mr. Howard developed a fever.  *Id.*

14.     On that day, according to Ms. Howard and Teresa Howard, Mr. Howard asked Dr. Xiang if he still had two years to live, as Dr. Xiang had told Mr. Howard and his family during the January 27, 2018, meeting.  According to Ms. Howard and Teresa Howard, Dr. Xiang told Mr. Howard again that Mr. Howard still had two years to live.

15.     On February 11, 2015, while at home, Ms. Howard noticed that Mr. Howard registered a fever.  Ms. Howard called Teresa Howard to take Mr. Howard to the emergency room for treatment.  Teresa Howard drove Mr. Howard to the Hospital where he was admitted.

**B.     Events After Admission To The Hospital**

16.     On Mr. Howard's admission to the Hospital, Stacy Piggee, the admitting nurse, conducted an assessment of Mr. Howard and rated him on the Morse Fall Scale between 65 and 70, indicating a high fall risk.  Def.'s Trial Ex. 1A, at 850-51, 869.

17.     When he was admitted to the Hospital, Mr. Howard reported that he had experienced a fall recently, meaning within the last 12 months.

18.     The Morse Fall Scale is a screening instrument that calculates a numerical value from 0-125 to determine a patient's potential for a fall.  Def.'s Trial Ex. 5, at 1-2.  According to

the Hospital's Fall Prevention Program, if a patient has a Morse Fall Scale assessment of 45 points or more, the patient is considered to be at high risk for falls.  *Id.*, at 4.

19.     The Hospital's Fall Prevention Program states that Registered Nurses are responsible for:  (1) screening veterans for fall risk using the Morse Fall Scale; (2) implementing Falls Protocol on appropriate patients and additional interventions when a patient is at risk for falls; (3) documenting reassessment of fall risk; (4) implementing post-fall care/interventions after a fall occurs; and (5) documenting post-fall events, injury assessment, and care in the patient's clinical record and incident report.  Def.'s Trial Ex. 1A, at 1-2.

20.     According to the Hospital's Fall Prevention Program, "Falls Protocol" are interventions to alert staff and visitors that a patient has an increased potential for falls.  Def.'s Trial Ex. 5, at 4.  If a patient qualifies based on the assessment, a designated fall prevention triangle is placed on the patient's identification armband, and a Falls Care Plan is initiated.  *Id.*, at 4.

21.     The Falls Care Plan should be in the medical record of the patient.

22.     The Hospital's Universal Fall Precautions – Inpatient for admitted patients includes, if applicable:  (1) nurse call light is secured to the bed and in easy reach of patient; (2) bed is in low position; (3) brakes are locked on beds, bedside commodes, and wheelchairs; (4) hourly rounds/toilet or offer urinal frequently as needed; (5) call lights are answered promptly; (6) keep ambulatory devices (*i.e.*, straight cane, quad cane, walker) within reach of patient, when applicable; (7) patient must wear non-slip foot wear when ambulating; (8) provide good lighting/use night-lights; (9) orient patient/family to surroundings and provide safety teaching; and (10) all personnel are responsible for eliminating hazard spills, objects obstructing the walkway, unstable furniture, etc.  Def's Trial Ex. 5, Attachment D.

23.     On the evening of February 13, 2015, for the first time, Teresa Howard observed Mr. Howard comment about a picture of water moving on the wall and slur his speech. When Teresa Howard informed the nurses and doctors about Mr. Howard's comments and slurred speech, they advised Teresa Howard that the antibiotic Mr. Howard was taking can have such side effects on a patient.

24.     Teresa Howard observed that Mr. Howard's comments about water moving and his slurred speech stopped after a time, until Mr. Howard was given another dosage of antibiotic. Teresa Howard testified that she observed Mr. Howard make comments about water moving and slur his speech several times while he was at the Hospital.

25.     On the morning of February 14, 2018, Mr. Howard expressed to Teresa Howard that he needed to use the restroom. Teresa Howard assisted Mr. Howard to the bathroom and to the bathroom sink. While Mr. Howard was at the bathroom sink, with Teresa Howard holding onto his hospital gown, Teresa Howard turned sideways against the wall and sat down on a tall trashcan in the corner of the bathroom. When Teresa Howard sat on the trashcan, Mr. Howard sat down in her lap. Then, Teresa Howard pushed Mr. Howard toward the bathroom sink, on which he steadied himself, while Teresa Howard stood up from the bathroom trashcan. There is no record evidence that Mr. Howard fell to the floor during this incident.

26.     Teresa Howard testified that she stumbled into the bathroom trash can when she backed up. Mr. Howard did not fall during this incident because he was dizzy or stumbling, according to Teresa Howard.

27.     Teresa Howard testified that, after this incident and after Mr. Howard was returned to his hospital bed, she immediately went to tell two male nurses about the incident.

28.     The nursing report titled "Fall Risk Assessment Note" and dated at February 14, 2015, at 13:54, states that Mr. Howard fell in the bathroom about 4:00 a.m., and two nurses assisted him back to bed.  Def.'s Trial Ex. 1B, at 800.  The nursing report also states that Teresa Howard did not tell the doctors on rounds on the morning of February 14, 2015, about the incident and that the fall was not reported to the day shift nurses, who authored the nursing report, by the night shift nurses.  *Id.*

29.     Ms. Howard testified that she went home on Friday, February 13, 2015, and returned to the Hospital on Saturday, February 14, 2015, in the evening.  When she returned, Mr. Howard began to talk to her, and she could not understand what he was saying.  She believed at that time that Mr. Howard may have had a stroke, and she told the nurses that something was wrong with Mr. Howard.

30.     Teresa Howard testified that, at that time, she tried to explain to Ms. Howard that Mr. Howard's slurred speech likely was a reaction to the medicine, but doctors ordered tests anyway to assess his condition.

31.     On or about February 14, 2015, doctors ordered a computed tomography ("CT") scan of Mr. Howard's head.  Def.'s Trial Ex. 1B, at 798.  According to the trial testimony of Thomas Huffman, M.D., an expert witness retained by Ms. Howard, the CT scan indicated that there was nothing broken and that no bleeding into the head had occurred.  Dr. Huffman further testified that there was no evidence of intracranial hemorrhage resulting from this fall based on the CT scan.  According to the trial testimony of Janet Scott, R.N., another expert witness retained by Ms. Howard, the CT scan did not show an injury or any evidence of a stroke.

32.     The nursing note dated February 15, 2015, at 1:13 a.m., states that Mr. Howard was identified as being "at risk for falls."  Def.'s Trial Ex. 1B, at 791.  The nursing note also lists

several interventions that were put into place for Mr. Howard: universal fall precautions, armband, gripper socks, reinforce need for assisted/supervised transfers, remain with patient during toileting, and create "safe exit side" for transferring from bed. *Id.*

33. According to the patient note dated February 15, 2015, at 8:54 a.m., authored by Rajesh Banderudrappagari, M.D., Mr. Howard was receiving a variety of medications including the antibiotic Cefepime as a 60 minute infusion through an IV every 12 hours and the antibiotic Vancomycin as a 90 minute infusion through an IV every 12 hours. Def.'s Trial Ex. 1B, at 784. Dr. Banderudrappagari also noted that Mr. Howard had episodic slurred speech, as well as gait ataxia, which lead to Mr. Howard's fall on February 14, 2015. *Id.* Dr. Banderudrappagari noted that the CT of Mr. Howard's brain did not indicate hemorrhaging, and he ordered magnetic resonance imaging ("MRI") for better evaluation of posterior fossa.[2] *Id.*

34. In an addendum to Dr. Banderudrappagari's patient note dated February 15, 2015, at 12:42 p.m., Leslie Billings, R.N., noted that Teresa Howard reported to the nursing staff at 1:00 p.m. on February 14, 2015, that Mr. Howard allegedly fell at 4:00 a.m. Def.'s Trial Ex. 1B, at 785.

35. On February 15, 2015, at 1:08 p.m., a note states that Mr. Howard just developed slurred speech with mild expressive aphasia. Expressive aphasia means that Mr. Howard was having to search for words or that his words would not come out as he intended to say them.

36. According to the progress note from February 16, 2015, authored by Pamela Gillman, R.N., at 1:05 a.m., a few hours before Mr. Howard's fall that is the subject of this lawsuit,

---

[2] The Court understands this to be a reference to the posterior cranial fossa, which is a large depression in the posterior of the floor of the cranial cavity that lodges the cerebellum, pons, and medulla oblongata. *See* Merriam-Webster, Cranial Fossa, https://www.merriam-webster.com/medical/cranial fossa (last visited March 6, 2019).

Mr. Howard's armband had a yellow safety alert tab that indicated he was a fall risk. Def.'s Trial Ex. 1B, at 771. The progress note also states that Mr. Howard's mental status was appropriate and that he was able to comprehend the seriousness of his condition, the need for treatment, and the need to follow instructions. *Id.* The note further states that Mr. Howard continued to be alert and oriented to himself, his surroundings, and the relative time. *Id.*, at 772. The note states that Mr. Howard was educated on his fall risk and the interventions that were in place, which he completely understood. *Id.*

37.    According to Nurse Gillman's note from February 16, 2015, the following Falls Care Plan was in place for Mr. Howard: Universal Fall Precautions, Armband, Gripper Socks, reinforce need for assisted/supervised transfers, remain with patient during toileting, created "safe exit side" for transferring from bed. *Id.*

38.    According to the narrative section of Nurse Gillman's note from February 16, 2015, Mr. Howard moved himself to the side of the bed to use the urinal, denied feeling dizzy, and returned himself to the bed and repositioned himself without difficulty. *Id.*, at 773. The note also states that the nurse informed Mr. Howard and Ms. Howard to call for assistance to get out of bed or use the bedside commode. *Id.* The note further states that Mr. Howard's bed was low and locked, that the call light was within reach, and that the nurse would continue to monitor. *Id.*

39.    Ms. Howard testified that, when Mr. Howard needed to use the bathroom, one of the family members typically helped Mr. Howard to the bathroom. Ms. Howard specifically testified that, the early morning of February 16, 2015, she walked with Mr. Howard to the bathroom, and after he sat on the toilet, she walked out of the room to tell a nurse that Mr. Howard was in the bathroom on the toilet.

40.     In the nursing note, Nurse Gillman noted that, at approximately 4:15 a.m., Ms. Howard went to the nurses' desk and told the nurse that Ms. Howard had just put Mr. Howard in the bathroom and that she did not have time to use the call light to alert the nurses for assistance before she did that.  Def.'s Trial Ex. 1B, at 773.  The nurse who then entered the room with Ms. Howard found Mr. Howard barefoot and sitting on the toilet in the bathroom.  *Id.*  The nurse instructed Mr. Howard to pull the call light string when he was finished in the bathroom and that the nurse would be standing right outside of the door.  *Id.*  The nurse stayed outside of the door for Mr. Howard's safety until he was ready to return to the bed because of the known claims that Mr. Howard had previously fallen.  *Id.*

41.     Ms.  Howard then pulled the call light string, and the nurse entered the bathroom where Ms. Howard was attempting to lift Mr. Howard off the toilet.  *Id.*  The nurse asked Ms. Howard to allow the nurses to assist Mr. Howard.  *Id.*

42.     Ms. Howard testified that, as a result of this exchange with the nurse, Ms. Howard asked to speak with the nursing supervisor and made a complaint.  Ms. Howard believed the nurse's tone and attitude were rude.  According to Ms. Howard, the nursing supervisor said that she would take care of the situation and promised that it would not occur again.  Ms. Howard testified that it did not occur again.

43.     With the nurse standing by him, Mr. Howard was able to raise himself off the toilet, stood without assistance, and denied that he felt light headed or dizzy while standing.  Def.'s Trial Ex. 1B, at 773.  Even Ms. Howard concedes that, during this incident, Mr. Howard got up and walked off on his own to return to his bed.  Mr. Howard informed the nurses that he felt dizzy after receiving shots to the stomach and antibiotics.  *Id.*  Mr. Howard walked slowly and steadily back to the bed without incident.  *Id.*  The nurses placed the bedside commode closer to Mr. Howard's

bed for greater convenience. *Id.* The nurses instructed Mr. Howard and Ms. Howard to call for assistance when he needed to get out of bed to use the bedside commode. *Id.*

44. The nursing note dated February 16, 2015, at 5:47 a.m., authored by Nurse Gillman, states that Mr. Howard was still subject to the same fall precautions that were put in place the previous day. *Id.*, at 772.

## C. The Fall On February 16, 2015

45. According to the trial testimony of Shauna Haynes, R.N., on direct examination, her shift at the Hospital officially began at 7:30 a.m. on February 16, 2015, but she often assumed the role of charge nurse and likely arrived around 7:00 a.m. to receive patient reports from the night nurses. Nurse Haynes has a bachelor's degree in nursing, a master's degree in nursing education, and a national certification from the oncology nursing society. She has worked in nursing for 17 years, and she has worked at the Hospital for 10 years.

46. Nurse Haynes testified that she remembered talking with the night nurse about Mr. Howard's unwitnessed fall that the family reported and that he was under strict fall precautions. After receiving the reports, Nurse Haynes went through the hand-off process where she would introduce herself to the patients to let them know that she would be taking care of them during the shift.

47. Nurse Haynes knew Mr. Howard and believed she and Mr. Howard had a good relationship. Nurse Haynes previously had been Mr. Howard's nurse in the Hospital's outpatient chemotherapy infusion room when Mr. Howard received chemotherapy treatment. Nurse Hayne worked as a nurse in the infusion room and also as a nurse for the Hospital's 16-bed inpatient hematology/oncology unit. On February 16, 2015, she was working as a nurse for the Hospital's inpatient hematology/oncology unit.

48.     After the hand-off process, Nurse Haynes took Mr. Howard's vitals and administered medications.  At 8:04 a.m., Nurse Haynes administered several medications to Mr. Howard.  Def.'s Trial Ex. 1D, at 33.  At this time, Nurse Haynes gave to Mr. Howard an intravenous infusion ("IV") of Cefepime, an antibiotic, through a drip that was set to run for 60 minutes.  *Id.*  Mr. Howard was also prescribed Filgrastim, a subcutaneous injection used to stimulate white blood cell growth, but the Filgrastim was not in the refrigerator where it was stored.  *Id.*, at 31.  Nurse Haynes entered a command in the computer to alert the pharmacy to bring up the Filgrastim.

49.     Mr. Howard complained that he felt dizzy after taking the antibiotics and injections—Mr. Howard was only prescribed one injection, Filgrastim, and two IV medications, Cefepime and Vancomycin, with Cefepime being the only IV medication administered on the morning of February 16, 2015, according to the Hospital records.  *Id.*, at 33.

50.     According to the Hospital records, Mr. Howard was prescribed an IV of both Cefepime and Vancomycin to continue on February 16, 2015.  Def.'s Trial Ex. 1B, at 769.  According to the Hospital records, Mr. Howard received both the Cefepime and Vancomycin at the same time on February 14, 2015, at 8:12 p.m.; February 15, 2015, at 8:48 a.m.; and February 15, 2015, at 8:04 p.m.  Def.'s Trial Ex. 1D, at 24, 27-29.  On February 16, 2015, at 8:05 a.m., Nurse Haynes administered only the Cefepime to Mr. Howard.  *Id.*, at 33.  At the same time, Nurse Haynes placed an order with the pharmacy for the Vancomycin for Mr. Howard.  Def.'s Trial Ex. 1C, at 23.  The parties agree that Vancomycin was not administered to Mr. Howard on February 16, 2015, prior to his fall.  After Mr. Howard fell on February 16, 2015, Dr. Banderudrappagari canceled the prescription for Vancomycin for Mr. Howard.  *Id.*, at 24.

51.    The patient note dated February 16, 2015, at 8:55 a.m., authored by Dr. Banderudrappagari, states that Mr. Howard was prescribed the same medications as Dr. Banderudrappagari's note from February 15, 2015.  Def.'s Trial Ex. 1B, at 769.  Mr. Howard was not prescribed any other medications that were administered by an IV on February 15 or 16, 2015. *Id.*, at 784.  Dr. Banderudrappagari again notes that Mr. Howard has episodic slurred speech and gait ataxia leading to falls.  *Id.*  However, on the morning of February 16, 2015, Mr. Howard was conscious and oriented times three; further, Mr. Howard's speech was normal.  Dr. Banderudrappagari notes that an MRI of Mr. Howard's brain showed no signs of a stroke or other focal lesions to explain his symptoms.  *Id.*

52.    According to the trial testimony of Ms. Howard on direct examination, Dr. Banderudrappagari came into the hospital room to examine Mr. Howard around 8:55 a.m. on February 16, 2015.  According to Ms. Howard, Mr. Howard sat up in his bed while Dr. Banderudrappagari listened to his heart and lungs, but Mr. Howard did not get out of the bed.

53.    The Hospital code sheet indicates that chest compressions were begun on Mr. Howard at 9:03 a.m.  Therefore, more likely than not, Mr. Howard's February 16, 2015, fall occurred sometime between the 8:55 and 9:03 range.

54.    Three individuals witnessed Mr. Howard's fall on February 16, 2015:  Ms. Howard, Nurse Haynes, and Melissa Kaplon, R.N.  The Court heard live testimony from Ms. Howard and Nurse Haynes and was provided with prior deposition testimony from Nurse Kaplon.

### 1.    Ms. Howard's Recollection

55.    According to Ms. Howard, after Dr. Banderudrappagari examined Mr. Howard, Nurse Haynes entered the room with a bottle of IV antibiotics in her hand.  Ms. Howard testified

that Mr. Howard asked Nurse Haynes to let him use the bathroom before she hooked up the IV. Nurse Haynes then sat Mr. Howard up on the bed, with his feet off the side of the bed.

56.     After Mr. Howard sat up, Ms. Howard testified that he laid down on the bed on his right side, with his arms next to his body.  Ms. Howard testified that she told Nurse Haynes that Mr. Howard was having another weak spell.

57.     According to Ms. Howard, Nurse Haynes then sat Mr. Howard back up on the bed. Ms. Howard testified that Nurse Haynes asked Mr. Howard what he saw when he looked at her and that Mr. Howard responded that he just saw the ocean going by and made a motion with his hand.

58.     According to the trial testimony of Ms. Howard on direct examination, Nurse Haynes then asked Nurse Kaplon to help her put Mr. Howard on the bedside commode.  Ms. Howard testified that, at this point, Nurse Haynes laid on the bed the IV bag that she brought into the room.  Ms. Howard recalls that both nurses sat Mr. Howard on the bedside commode, which was located at the foot of the hospital bed with the opening of the commode facing the front of the bed.

59.     Ms. Howard testified that, once Mr. Howard was sitting on the commode, Ms. Howard was positioned at the foot of the bed, Nurse Kaplon was at Mr. Howard's side, and Nurse Haynes was standing in front of Mr. Howard.  Ms. Howard testified that Nurse Haynes turned about halfway around in front of Mr. Howard and reached over to pick up the IV bag to hook it up to the IV tubing located at the front of the hospital bed.

60.     While Nurse Haynes was hooking up the IV bag, after just a little bit, Mr. Howard folded over, fell off the commode, and hit the floor.

61.     Ms. Howard recalls Mr. Howard hollering loudly when he fell, "Oh!"

62.     According to Ms. Howard, Nurse Haynes dropped the IV bag, reached over to where Mr. Howard fell, and grabbed Mr. Howard's shoulder to turn him over.  Ms. Howard recalled that Mr. Howard was laying face down, more on his right shoulder than anything else, and Ms. Haynes got him by his left shoulder and pulled him back over onto his back.

63.     Ms. Howard testified that Ms. Howard ran over to where Mr. Howard fell and jerked the bedside commode out of the way so that she could reach Mr. Howard.  Ms. Howard then claims that she straddled Mr. Howard and asked him if he could talk to her.  Mr. Howard mouthed the word "no" but did not audibly respond.

64.     After this, based on Ms. Howard's recollection, Mr. Howard's eyes rolled into the back of his head, and Ms. Howard told the nurses to call the code team.  Nurse Kaplon left to call the code team, while Nurse Haynes grabbed Mr. Howard by the feet, jerked him away from the bed, and began cardio-pulmonary resuscitation ("CPR").

65.     According to Ms. Howard, at this point, Ms. Howard backed up into the corner of the room because she could not reach the door.

66.     The code team came into the room, and a male nurse took over CPR for Nurse Haynes.  Ms. Howard testified that she did not want to be chased from the room, so she stood back in the corner while the code team was in the room.

67.     The code team performed CPR on Mr. Howard, shocked him with a defibrillator, and got a heartbeat, but Mr. Howard was not breathing.

68.     The code team lifted Mr. Howard off the ground and put him back onto his hospital bed.  According to Ms. Howard, the code team just lifted Mr. Howard by his arms and legs; they did not cradle his head.

69.     A member of the code team was attempting to intubate Mr. Howard, using the bag to help Mr. Howard breathe.

70.     Ms. Howard concedes that there was blood everywhere in the room because Mr. Howard cut his head when he fell.

## 2.     Nurse Haynes' Recollection

71.     According to Nurse Haynes, at approximately 9:00 a.m. on February 16, 2015, Ms. Howard came to Nurse Haynes at the nurse's desk and said that Mr. Howard needed to use the restroom.  Nurse Haynes asked Nurse Kaplon to assist her with Mr. Howard.

72.     When Nurse Haynes started her shift that day, the only order that was in place with respect to fall precautions was the use of the bedside commode.

73.     Once in the room, Nurse Haynes moved the bedside commode from the bathroom, where it was stored, to the side of Mr. Howard's hospital bed.  Nurse Haynes asked Mr. Howard to sit up so that he could get out of bed.  Mr. Howard sat on the side of the bed for a few minutes. Nurse Haynes asked Mr. Howard if he could stand, and he said that he could stand.

74.     Nurse Haynes testified that Mr. Howard then stood up, pivoted, and sat in the bedside commode.  While Mr. Howard was sitting down, Nurse Haynes was right beside him and did not use any physical exertion to lift Mr. Howard.  Nurse Haynes also asked Mr. Howard if he felt any dizziness, and he said that he did not.  According to Nurse Haynes, Mr. Howard did not look like he was dizzy and did not say anything unusual before or during his transfer to the bedside commode.  Nurse Haynes testified that Mr. Howard did not exhibit any weakness or unsteadiness and that his speech was clear, appropriate, and coherent.

75.     While Mr. Howard was on the commode, Nurse Haynes was standing beside him and in front of the opening of the commode.  Nurse Haynes testified that she was no more than an

arm's length away from Mr. Howard during this time, and there was not enough space in the room to be further than an arm's length away from where the bedside commode was located.

76. Nurse Haynes was talking with Mr. Howard while he was using the bedside commode.

77. Nurse Haynes recalls that Mr. Howard stopped talking and went forward, fell to the ground, and hit his head.

78. Nurse Haynes testified that she tried to catch Mr. Howard but could not stop him before he hit the floor.

79. Nurse Haynes recalls that Mr. Howard moved forward very fast with seizure-like activity.

80. Nurse Haynes recalls that, after Mr. Howard hit his head on the floor, he began to have seizure like activity, such as jerking. Nurse Haynes steadied his head to prevent him from hitting anything in the tight space. Mr. Howard exhibited jerking motions for between 30 and 90 seconds, based on what Nurse Haynes recalls. Once Mr. Howard stopped jerking, Nurse Haynes heard him make a gasping sound, checked his pulse again and found nothing, and called for the code team. Next, according to Nurse Haynes, she and Nurse Kaplon rolled Mr. Howard over and began to administer CPR.

81. Nurse Haynes created three written records of the event close in time to the event on February 16, 2015. Nurse Haynes recorded a transfer note at 9:53 a.m. on February 16, 2015, describing the event. In another note written by Nurse Haynes on February 16, 2015, at 10:13 a.m., she describes the event. There also was a written incident report created February 16, 2015, which describes the event. In each of those written descriptions, Nurse Haynes describes Mr.

Howard as slumping forward or leaning forwarding and falling to the ground from the bedside commode.

82.     According to Nurse Haynes, when the code team arrived, the code team took over CPR compressions from Nurse Haynes and Nurse Kapoan.

83.     Nurse Haynes then asked Ms. Howard to walk with her, and she sat with Ms. Howard in the break room while the code team resuscitated Mr. Howard.  After the code team left the room with Mr. Howard, Nurse Haynes walked Ms. Howard to the intensive care unit ("ICU").

### 3.     Nurse Kaplon's Prior Testimony

84.     Nurse Kaplon did not testify live before the Court at trial.  Instead, the Court has reviewed her prior deposition testimony.   Def.'s Trial Ex. 10.

85.     According to Nurse Kaplon, she was at the nurse's station when Nurse Haynes asked for her assistance with Mr. Howard as he used the bedside commode.  *Id.*, at 20.  Nurse Kaplon did not remember if Ms. Howard came to the nurse's station and asked for assistance or if Nurse Haynes came to Nurse Kaplon separately and asked for assistance.  *Id.*, 19-20.  When Nurse Kaplon walked into the room, Mr. Howard was laying on the bed, Ms. Howard was seated in a chair across the room from the doorway, and the bedside commode was already in the room.  *Id.*, at 29, 31.

86.     Nurse Kaplon recalled that both nurses assisted Mr. Howard sit up on the side of the bed where they let him sit for a few minutes.  *Id.*, at 29.  Nurse Kaplon stated that, while Mr. Howard was sitting on the bed, he did not seem lightheaded or confused, he did not slur his speech, and he was totally lucid.  *Id.*, at 29-30.  Nurse Kaplon also stated that she always asks a patient if he or she is ready to stand up before having the patient stand and that Mr. Howard was asked if he was ready to stand.  *Id.*, at 32.

87.     Nurse Kaplon explained when asked that, if the patient is able to transfer and sit on a bedside commode, there is no reason why she needs to have her hands on the patient.  *Id.*, at 55.

88.     According to Nurse Kaplon, Mr. Howard was carrying on a perfectly fine conversation with the nurses as he sat on the bed and transferred to the bedside commode.  *Id.*, at 33.  Nurse Kaplon recalled that the bedside commode was located on the floor in proximity to the middle of the bed, facing the head of the bed, with only an inch between the commode and bed. *Id.*, 38-39.  Mr. Howard stood up from the bed, pivoted, and sat back down.  *Id.*, at 33.  The nurses provided minimal assistance to Mr. Howard during the transfer, meaning according to Nurse Kaplon that they had a hand on Mr. Howard just enough to steady him.  *Id.*, at 33-34, 54.  Once Mr. Howard was seated and secured on the bedside commode, Nurse Kaplon took her hands off Mr. Howard.  *Id.*, at 34.  The bedside commode has handrails that a patient can use for support. *Id.*

89.     While Mr. Howard was on the commode, Nurse Kaplon was positioned behind him, and Nurse Haynes was standing in front of Mr. Howard, while giving him enough space for privacy.  *Id.*, at 34-35.  While Mr. Howard was on the commode, Nurse Kaplon and Nurse Haynes carried on a conversation with him.  *Id.*, at 35.  Nurse Kaplon does not recall Nurse Haynes hanging anything on the IV pole.  *Id.*

90.     According to Nurse Kaplon, out of nowhere, Mr. Howard folded and collapsed on the floor head first.  *Id.*, at 36.  Nurse Kaplon stated that, based on her recollection, Nurse Haynes was anywhere from two to four feet away from Mr. Howard when he fell forward.  *Id.*, at 36-37. After Mr. Howard fell, Nurse Kaplon pulled the commode out of the area to reach Mr. Howard. *Id.*, at 40.  Nurse Kaplon and Nurse Haynes immediately turned Mr. Howard over and assessed him.  *Id.*, at 41.  Mr. Howard tried to talk, but his eyes were fixed, and he lost a pulse.  *Id.*, at 40.

The nurses maneuvered Mr. Howard into the doorway where there was more room and started to administer CPR.  *Id.*, at 41.  Nurse Kaplon left the room when the code team arrived and went back to her patients.  *Id.*, at 42.

91.     After Mr. Howard was assisted on to the bedside commode and while he was sitting on the commode, neither Nurse Haynes nor Nurse Kaplon had a hand touching Mr. Howard.

**D.     After The February 16, 2015, Fall**

92.     Soon after Mr. Howard's fall, the code team intubated Mr. Howard.  The code team then took Mr. Howard to the ICU where a CT scan was done of his head at 11:11 a.m.

93.     Ms. Howard did not recall a CT scan being done that day.

94.     After her shift, Nurse Haynes went to the ICU and spoke with Ms. Howard, expressing how sorry she was this had happened.

95.     On February 17, 2015, at 12:44 p.m., Mr. Howard was extubated.  Later that day, at 3:14 p.m., Mr. Howard received an MRI based on acute onset quadriplegia.  Def.'s Trial Ex. 2A, at 260.

96.     Ms. Howard testified that, the night of February 17, 2015, Mr. Howard continued to cry out in pain.

97.     Ms. Howard testified that, on the night of February 18, 2015, a halo collar was placed on Mr. Howard.  Ms. Howard concedes that her days and nights ran together during this time.

98.     On February 18, 2015, Mr. Howard was transferred from the Hospital to the University of Arkansas for Medical Sciences Hospital ("UAMS") for further treatment because it was determined that Mr. Howard had an odontoid fracture with cord compression requiring neuro-surgery.  Def.'s Trial Ex. 2A, at 4.

99.     The progress note on February 19, 2015, written by Heath Pinckard-Dover, M.D., states that Mr. Howard had type II odontoid facture and central cord syndrome. *Id.*, at 23. Dr. Pinckard-Dover's progress note further states that she talked with Noojan Kazemi, M.D., about Mr. Howard. *Id.*

100.    On February 20, 2015, Mr. Howard underwent a successful surgery at UAMS performed by Dr. Kazemi. *Id.*, at 6-7.

101.    According to the progress note written by Devin L. Dickson, M.D., from February 25, 2015, he spoke with Dr. Xiang who advised that Mr. Howard had a poor prognosis and had failed multiple treatments for his multiple myeloma prior to the cervical fracture that occurred on February 16, 2015. *Id.*, at 59. Dr. Dickson further states in the progress note that Dr. Xiang recommended that Mr. Howard be discharged to hospice instead of rehabilitation. *Id.*

102.    Based on the Hospital records, Mr. Howard's family agreed that Mr. Howard should be moved to hospice at his home. *Id.*, at 64.

103.    Mr. Howard was discharged from UAMS to hospice at his home on March 2, 2015. *Id.*, at 6. Mr. Howard remained at his home in hospice until he died on March 14, 2015. Def.'s Trial Ex. 4.

104.    Ms. Howard testified that, although Mr. Howard's pain level improved, he could not move, did not ever improve, and continued to take a lot of pain medication.

105.    Teresa Howard testified that, after the surgery at UAMS, Mr. Howard stopped crying out in pain all of the time, so he improved a little, but Mr. Howard never was able to move his arms and legs after that point.

106.     The Certificate of Death lists, in order, the following causes of death:  "Cardiac-Respiratory Arrest;" "Spinal Fracture/ Cervical (C2);" "Multiple Myeloma;" "Paralysis."  Def.'s Trial Ex. 4.

107.     The Certificate of Death was completed by the hospice nurse, according to record evidence.

108.     Record evidence includes a note indicating that the individual who completed the Certificate of Death "was asked per the patient care giver to include accident sustained at VA on February 16, 2015, on death certificate, resulting in patient spinal/neck fracture at C2 causing paralysis along with hospital diagnosis."

### E.     Expert Testimony

109.     At trial, Ms. Howard and the Government presented expert witness testimony.

### 1.     Janet Scott, R.N.

110.     At trial, Ms. Howard presented testimony from Janet Scott, a nurse consultant and Registered Nurse, as an expert witness in nursing care.  Ms. Scott received her bachelor's degree from the University of Central Arkansas and Master of Health Management degree from Webster University.  Ms. Scott served in the United States Army Nurse Corps for 20 years before retiring as a Lieutenant Colonel in the United States Army and worked at several hospitals throughout her career starting in 1974, including but not limited to Baptist Hospital in North Little Rock, Arkansas.

111.     At the time she testified in this case, the last time Ms. Scott actively worked as a nurse was in March 2011 at the White County Medical Center; she has been retired from active nursing since that time.

112.    Ms. Scott testified that the Hospital's Fall Prevention Program is a part of the standard of care for nurses that applies in this case.

113.    When Mr. Howard entered the emergency room at the Hospital on February 11, 2015, his Morse Fall Scale was assessed as a 65 by the emergency room nurse and 70 by the admission assessment.

114.    Ms. Scott testified that, when she was in nursing school, nurses were taught that a nurse should provide for the patient those things the person cannot not safely provide for himself or herself, which includes how to help a patient keep from falling.  According to Ms. Scott, these are standard of care issues.

115.    Ms. Scott testified that, based on the incident early in the morning on February 16, 2015, when Ms. Howard assisted Mr. Howard to the toilet, left him sitting on the toilet, and went to inform the nursing staff, Mr. Howard and Ms. Howard were noncompliant with the nurses' instructions, and those instructions needed to be reinforced or additional intervention added.

116.    Further, Ms. Scott testified that, if Ms. Howard's recollection is correct that Mr. Howard slumped over on the side of the bed after he sat up to use the bedside commode and commented on the ocean moving by, then the nurses breached the standard of care by allowing Mr. Howard to get out of the bed.  According to Ms. Scott, in that situation, the nurses should have assisted Mr. Howard in using the bedside urinal, with the nurses standing on both sides of Mr. Howard.

117.    Ms. Scott acknowledges that Nurse Haynes never started or administered to Mr. Howard the Vancomycin the morning of February 16, 2015.  She did administer to him the Cefepime.

118.     In this situation where the nurses permitted Mr. Howard to use the bedside commode, Ms. Scott opined that the only way to protect Mr. Howard while he was sitting on the bedside commode was for the nurses to have a hand on him or hang on to him so that the nurses could feel and intervene when he started to move.  She testified that, because Mr. Howard was extremely likely to stand up from the commode, which would have been dangerous, and because his weakness was episodic, the nurses should have had a hand on him to prevent the fall.

119.     Ms. Scott stated on direct examination that the failure of at least one of the nurses to have a hand on Mr. Howard while he was on the bedside commode was a breach of the standard of care.

120.     Ms. Scott further testified that at least one nurse should have been standing directly in front of Mr. Howard paying full attention to him while he was on the bedside commode in order to catch Mr. Howard if he fell off of the commode.  If one of the nurses was standing directly in front of Mr. Howard in this manner, the nurse could have slowed his motion, directed his body back toward the bed, or given Mr. Howard support while being lowered to the floor.

121.     Ms. Scott stated on direct examination that the failure of at least one of the nurses to stand in front of Mr. Howard while he was sitting on the bedside commode was a breach of the standard of care.

122.     She considered it more likely than not that the nurses could have prevented the injury if they had a hand on Mr. Howard while he was on the bedside commode, although she acknowledged no one can know absolutely.

123.     According to Ms. Scott, even though having two female nurses standing around Mr. Howard while he used the bedside commode was an undignified situation, it was still a breach

of the standard of care for one of the nurses not to have a hand on Mr. Howard under the circumstances to guard his health and safety.

124.    Ms. Scott acknowledged that, on February 14, 2015, after Teresa Howard reported a fall, an order was placed for a bedside commode as a fall precaution but that order did not specify or mandate the number of nurses who needed to be present to use the bedside commode.

125.    Ms. Scott testified that all of the fall preventions and protocols in Nurse Gillman's note from February 16, 2015, were within the standard of care.

126.    Ms. Scott offered no opinions on the cause of Mr. Howard's death.

**2.    Holly Langster, B.S.N., F.N.P., M.H.A., D.N.P.**

127.    The Government presented testimony from Holly Langster, a nurse practitioner and nurse administrator, as an expert in nursing care.  Ms. Langster is currently the Executive Director of Clinical Operations at the Myeloma Institute of UAMS.  Ms. Langster received her bachelor's degree from Bradley University, Master of Nursing Family Nurse Practitioner from University of Illinois Chicago, Master of Healthcare Administration from Southern Illinois University, and Doctor of Nursing Practice from American Sentinel University.  Def.'s Trial Ex. 6.  Ms. Langster has also worked as the Nursing Administration Project Management at Baptist Hospital in North Little Rock, Arkansas, and as Chief Nursing Officer of Baptist Hospital in Heber Springs, Arkansas.  *Id.*

128.    Ms. Langster testified that part of the standard of care for nurses includes recognizing the patient's dignity and providing an opportunity for the patient to have some privacy and a sense of normalcy when the patient is in an embarrassing situation.

129.    Ms. Langster further testified that the standard of care applicable to Mr. Howard's situation required that the nurse be present in the room when Mr. Howard was on the bedside

commode. As Ms. Langster observed, the nurses did not take their hands off of Mr. Howard until he was seated and secured on the bedside commode. While seated, Mr. Howard was conversing in a normal manner, without slurred speech.

130.    According to Ms. Langster, Mr. Howard had instances of slurred speech and complained that he felt dizzy after taking the belly shot and after taking antibiotics, but Ms. Langster observes that the records do not indicate that Mr. Howard was dizzy or had slurred speech when the nurses were in his room to assist him in using the bedside commode on February 16, 2015.

131.    Ms. Langster further testified that she does not teach nurses to have a hand on the patient.

132.    Ms. Langster opines that, because Nurse Haynes was standing with her legs in front of the bedside commode, within an arm's length, while Mr. Howard was on the commode, Nurse Haynes was acting within the standard of care.

133.    Ms. Langster also testified that the record reflects that the nurses were attentive to Mr. Howard's needs, that his fall risks were updated throughout his stay, and that the nurses administered a higher level of attention and care to Mr. Howard when it was required.

134.    A nurse placing a hand on a patient while they are on the bedside commode is not guaranteed to prevent them from sustaining an injury if the patient falls, according to Ms. Langster. Ms. Langster further testified that, depending on where the nurse placed a hand, the patient could fall in a way that is away from where the nurse's hand is placed.

135.    Ms. Langster conceded that, if Ms. Howard's recollection of the event is correct and Mr. Howard claimed immediately before standing that he saw the ocean going by when asked

by the nurse what he saw, the nurses probably should not have stood him up off of the bed to use the bedside commode.

### 3. Thomas Huffman, M.D.

136.     In addition, Ms. Howard presented as an expert witness Thomas Huffman, M.D., a physician and surgeon licensed in the states of Arkansas and Missouri.  Dr. Huffman received his education from the University of Missouri at Columbia as well as postgraduate training at the University of Missouri at Kansas City.  Dr. Huffman is board certified in family medicine and in emergency medicine, as well as a special added qualification in geriatrics.  Dr. Huffman practices emergency medicine, family medicine, and geriatric medicine for a federally qualified healthcare center in Kimberling City, Missouri.

137.     During Dr. Huffman's direct examination, counsel for Ms. Howard offered Dr. Huffman as an expert in family medicine, emergency medicine, and geriatric medicine.

138.     Counsel for the Government objected to Dr. Huffman's offering testimony regarding the standard of care for nurses, and counsel for Ms. Howard responded that Dr. Huffman throughout his career as a physician has managed the activities of nurses and should be allowed to comment on the actions of nurses in a given situation.

139.     According to Dr. Huffman, he has worked at hospitals and rural health clinics.  Dr. Huffman also testified that he was the medical director of the Scaggs Community Hospital in Branson West, Missouri, from 1996 to 2009, where he collaborated with nurse practitioners and was responsible for overseeing quality assurance.

140.     Dr. Huffman opines that the best way for a nurse to have control over a patient while the patient is on a bedside commode, in order to keep the patient from falling off, is to have a hand either on the patient or on the patient's clothes.  According to Dr. Huffman, the nurses were

in the room because Mr. Howard was a fall risk. Dr. Huffman opines that the nurses were not close enough in front of Mr. Howard to be able to catch him if he fell.

141. Dr. Huffman testified that, throughout his career as an emergency room physician and family practice doctor, he has seen 10 to 20 spinal fractures in acute situations and additional patients with spinal fractures in his practice. Dr. Huffman acknowledged he is not a neurosurgeon and could not run treatment from start to finish regarding a neurological issue, however.

142. Dr. Huffman testified that, throughout his career as a family practice doctor, he has participated in the treatment of approximately 20 to 25 patients with multiple myeloma. Dr. Huffman acknowledged that he is not a hematologist or oncologist, however.

143. Dr. Huffman confirmed that multiple myeloma patients suffer an increased risk of bone fractures as a result of the disease.

144. Dr. Huffman testified that, based on his review of the medical records, Mr. Howard's neutropenic fever was subsiding, his infection or risk of infection was subsiding, and his white blood cell count was increasing in the days before February 16, 2015.

145. Dr. Huffman testified that Vancomycin may cause side effects of dizziness and loss of balance.

146. Dr. Huffman testified that he does not believe that Mr. Howard had a true seizure during the February 16, 2015, incident. Mr. Howard was interviewed by a physician after these events and claimed he remembered falling and then lost consciousness. Dr. Huffman claims a patient does not remember once the patient begins seizing, so Dr. Huffman doubts a seizure caused the fall. Further, Mr. Howard relayed to the physician that this event was not like his prior seizures and that he had not had a seizure since the 1980s because his condition was well-controlled through

medication. Dr. Huffman testified Mr. Howard was a little above therapeutic range with his seizure medication at the time of these events.

147. Instead, Dr. Huffman believes that Mr. Howard was unconscious when he exhibited the seizure-like activity and that his unconsciousness was caused possibly by striking his forehead on the floor and possibly by fracturing his spine.

148. Dr. Huffman testified that he did not believe Mr. Howard suffered from cardiac arrest resulting in the fall because, from the descriptions of the event, Mr. Howard was breathing on his own for a period of time after his fall. Then, only after the fall did his breathing become shallow, and he lost a pulse.

149. Dr. Huffman testified that to a reasonable degree of medical certainty Mr. Howard's fall from the bedside commode caused the odontoid fracture with subsequent cord contusion bruising and probably central cord syndrome.

150. According to Dr. Huffman, even if he assumed for the sake of analysis that Mr. Howard's cord contusion was not caused by the fracture but instead was caused by exacerbation of a preexisting injury, Dr. Huffman's opinion is that the fall from the bedside commode culminated in Mr. Howard's pain and suffering.

151. Dr. Huffman stated that the injury resulted in Mr. Howard's experiencing severe pain and near paralysis.

152. Dr. Huffman further testified that the pain Mr. Howard experienced had more to do with the odontoid fracture and central cord syndrome than his multiple myeloma.

153. According to Dr. Huffman, central cord syndrome is the result of an injury to the spinal cord that produces nerve dysfunction for which sometimes there is significant recovery.

154.    Central cord syndrome is characterized by swelling of the cord.  Central cord syndrome typically produces a skipped area where there is upper extremity dysfunction and lower extremity dysfunction but an area between the two ends remains preserved and functioning.

155.    Dr. Huffman opined that the actions or omissions on the part of the nurses and staff at the Hospital exacerbated Mr. Howard's injury after he fell.  According to Dr. Huffman, the nurses did not protect Mr. Howard from potential displacement that could have occurred when the nurses moved him after the fall and as a result of several specific instances.

156.    Specifically, Dr. Huffman testified that nurses asked Mr. Howard to nod his head in response to questions either side to side or up and down, as he was intubated and unable to speak.

157.    The nurses also placed a nasogastric tube in Mr. Howard after he arrived at the ICU, causing Mr. Howard to vomit.

158.    Further, Dr. Huffman testified that he reviewed no record indicating anyone kept in-line traction on Mr. Howard's head while they intubated him or extubated him to avoid movement of his neck and to protect his cervical spine.

159.    Dr. Huffman testified that, when a CT scan was taken of Mr. Howard's head after he arrived in the ICU, an image of his spine should have been taken on February 16, 2015, because Mr. Howard was at an increased risk for fracture because he went into cardiac arrest, he stopped breathing and was intubated, and he had multiple myeloma.

160.    Dr. Huffman did acknowledge that it would be hard for him to say what difference, if any, it would have made to image Mr. Howard's spine at the time the CT scan was done as opposed to when it was imaged and that he could not say within any degree of medical certainty what difference if any it would have made.

161.     Dr. Huffman conceded that chart entries made in the ICU through February 17, 2015, indicated that Mr. Howard was able to move his extremities, although his movements were weak.

162.     Dr. Huffman reviewed notes that indicate that, after Mr. Howard was extubated on February 17, 2015, Mr. Howard developed the inability to move his arms and hardly felt anything.

163.     After that complaint, a doctor was notified, and a complete neurological evaluation was performed on Mr. Howard.

164.     According to Dr. Huffman, the evaluation indicated an odontoid process fracture at C2 with contusion of the cord from the cervicomedullary junction to C4 and C5.

165.     After Mr. Howard underwent surgery at UAMS, Mr. Howard was stable and marginally improving.

166.     Dr. Huffman stated that he did not believe Mr. Howard would ever make a full recovery after he underwent surgery at UAMS.

167.     Dr. Huffman acknowledged that the surgery at UAMS was not intended to and did not address the cord syndrome.

168.     Dr. Huffman believed that it was more likely than not that Mr. Howard would have lived longer than he did if he had not fallen from the bedside commode.  Dr. Huffman also stated that he believed that Mr. Howard's fall caused Mr. Howard to die when his death occurred.

169.     According to the trial testimony of Dr. Huffman on cross examination, there is evidence in Mr. Howard's charts after his surgery at UAMS that Mr. Howard exhibited neurological improvement.

170.     Further, Dr. Huffman conceded that he did not find enough information in the record to determine the exact sequence of events of Mr. Howard's death.

171.    Dr. Huffman also could not say within a reasonable degree of medical certainty how much longer Mr. Howard would have lived.  Dr. Huffman could not say how many months or weeks Mr. Howard would have lived, but he did testify that, qualitatively, Mr. Howard would have lived longer.

### 4.    Christopher Loftus, M.D.

172.    The Government presented Christopher Loftus, M.D., a neurosurgeon, as an expert. Dr. Loftus received his bachelor's degree from Dartmouth College and medical degree from State University of New York—Downstate Medical Center in Brooklyn, New York.  Def.'s Trial Ex. 7, at 1.  He has been a neurosurgeon for 33 years.  *Id.*  Dr. Loftus is a Professor of Neurosurgery at Temple University School of Medicine in Philadelphia, Pennsylvania, and board certified in neurosurgery.  *Id.*, at 4.  Dr. Loftus is also the Chief Medical Officer for the Division of Neurological and Physical Medicine Devices, Office of Device Evaluation, Center for Devices and Radiological Health with the United States Food and Drug Administration.  *Id.*, at 3.

173.    According to Dr. Loftus, epilepsy is the result of abnormal discharges in the brain. He explained that seizures take many forms, including but not limited to abnormal motor movements, with or without loss of consciousness, and with or without facial automatisms, funny ticks, or the like.

174.    According to Dr. Loftus, patients on anti-seizure medication may still experience seizures.

175.    Dr. Loftus testified that, in his experience, he really does not see falls that cause seizures.  He opined that seizures typically do not work that way.

176.    Dr. Loftus is not familiar with patients who receive Vancomycin becoming dizzy as a side effect of the medication.

177.     Based upon Dr. Loftus's review of the MRI of Mr. Howard's C2 spine taken on February 17, 2015, there is evidence that the cord contusion likely occurred between C3 and C4 because that is where the injury appears to be the most profound, although there is some evidence of the injury from C2 through C4 or C5.  *See* Def.'s Trial Ex. 8.

178.     Dr. Loftus opines that the central cord syndrome is below where Mr. Howard's odontoid fracture was.  In Dr. Loftus's experience, he has never seen a C2 odontoid fracture cause central cord syndrome.

179.     In Dr. Loftus's experience, a classic central cord syndrome impacts the arms worse than the legs.  Generally, it occurs frequently with older people due to arthritis and results from a hyperextension injury caused by tripping on a rug, tripping while walking, or hitting the head on something.  In a typical case, a patient falls, and the cord gets squeezed.  This type of injury can happen in younger people, but it takes a really high velocity accident to do it, according to Dr. Loftus.

180.     The surgery at UAMS on February 20, 2015, repaired Mr. Howard's odontoid fracture at the C2 level, according to Dr. Loftus.

181.     According to Dr. Loftus, if Mr. Howard's diagnosis with multiple myeloma was removed from his underlying medical conditions, Dr. Loftus would have expected Mr. Howard to get better over time because the type of cervical cord injury sustained by Mr. Howard slowly, incrementally improves over time.

182.     For central cord syndrome to heal, it takes a couple of weeks for the swelling to go down and then it takes pretty extensive rehabilitation, according to Dr. Loftus.

183.     Dr. Loftus does not know whether the fall from the bedside commode that resulted in Mr. Howard hitting his head resulting in a hyperextension injury or resuscitation efforts after Mr. Howard's fall lead to Mr. Howard's central cord syndrome.

184.     Dr. Loftus opined that Mr. Howard's central cord syndrome did not cause his death on March 14, 2015.  Dr. Loftus opined that, instead, Mr. Howard was getting better, that his fracture was properly repaired, and that he was improving.  Dr. Loftus also opined that, even though Mr. Howard's central cord syndrome was not fixed, the records indicate that the central cord syndrome was improving after his surgery at UAMS.

185.     According to Dr. Loftus, based on his review of the UAMS records after Mr. Howard's surgery, Mr. Howard saw improvement in the upper extremity and increased strength in the lower extremities.

186.     Once Mr. Howard's family elected to hospice, the UAMS notes switch to palliative care.

187.     Even though the cervical fracture is on Mr. Howard's death certificate and mentioned throughout several hospice records, Dr. Loftus opined that it was not part of the cause of death.

### E.     Treater Zhifu Xiang, M.D.

188.     Dr. Xiang, who began treating Mr. Howard for multiple myeloma in May 2014 and treated him through the time of his death, also testified.

189.     Dr. Xiang is a hematologist employed at the Hospital and employed part-time at UAMS.  Hematology is a subspecialty of medicine that focuses on disorders related to blood.

190.     Dr. Xiang confirmed that multiple myeloma patients are at an increased risk for brittle bones and fractures.  During his treatments, Mr. Howard took Zometa at various times, which is a bone strengthener used to reduce the risk of bone fractures.

191.     Throughout the time that Dr. Xiang treated Mr. Howard, at various times, Mr. Howard's multiple myeloma was progressing or getting worse.  Overall, Mr. Howard received five lines of treatment in four years for his multiple myeloma, which is typical.

192.     Dr. Xiang testified that, in March 2014, doctors discussed with Mr. Howard discontinuing treatment and going into hospice care.  According to Dr. Xiang, doctors would have discussed that because available treatments for his disease were limited and his disease was progressing.

193.     In March 2014, Mr. Howard indicated he was not interested in hospice care at that time and wanted to continue treatment.

194.     Dr. Xiang testified that, in November 2014, he discussed with Mr. Howard that, because of Mr. Howard's good performance status at that time, Mr. Howard might want to consider a stem cell transplant.

195.     Mr. Howard was not qualified to receive a stem cell transplant at the Hospital because he was over the age of 70 and because the Hospital does not allow patients over the age of 70 to receive stem cell transplant.

196.     As a result, Dr. Xiang recommended that Mr. Howard seek a second opinion at the Myeloma Institute at UAMS; the Mayo Clinic, in Rochester, Minnesota; or the M.D. Anderson Cancer Clinic in Houston, Texas.  In response, Mr. Howard informed Dr. Xiang that he believed he was receiving good care at the Hospital and that he understood the risks and benefits of stem cell transplant.  Mr. Howard chose to stay at the Hospital for his multiple myeloma treatment.

197.     According to Dr. Xiang's progress note from February 10, 2015, Mr. Howard's past treatments were interrupted by complications from treatment.  Dr. Xiang's notes indicate that Mr. Howard's multiple myeloma appeared not well controlled and that his multiple myeloma had recently progressed.  Def.'s Trial Ed. 1A, at 880.  Dr. Xiang's notes further relate that, if Mr. Howard's white blood cell counts improved, Dr. Xiang might consider switching to a new drug, Pomalidomide.  *Id.*  Dr. Xiang also notes that Mr. Howard was unwilling to seek a second opinion or clinical trials from the Myeloma Institute at UAMS or another institute.  *Id.*

198.     According to Dr. Xiang, he recommended palliation for Mr. Howard on February 10, 2015, and, if Mr. Howard's white blood cell counts improved, Dr. Xiang may have considered a switch to Pomalidomide.

199.     Dr. Xiang stated that palliation is for patients who have exhausted other standard treatment or multiple lines of treatment and that palliation is chemotherapy treatment that is used just to try to control the multiple myeloma.

200.     According to Dr. Xiang, the symptoms of dizziness, slurred speech, and imbalance can all be associated with or side effects of multiple myeloma and the treatments for multiple myeloma.

201.     According to Dr. Xiang, it is common to administer Vancomycin and Cefepime to multiple myeloma patients to treat neutropenic fever.

202.     He acknowledged that one of the side effects of Vancomycin may be dizziness and fatigue, although he is not aware how common these side effects are when Vancomycin is administered.

203.     Dr. Xiang does not believe it is common to become dizzy after being administered Cefepime.

204. Dr. Xiang testified that, during Mr. Howard's stay in the Hospital, before the fall on February 16, 2015, doctors decreased the dose and changed the medication administered to Mr. Howard for his fever, indicating improvement, and Mr. Howard's white blood cell count was improving.

205. Dr. Xiang confirmed that, when a patient through his performance demonstrates that he is not able to take the medication or when a patient is bedridden, doctors usually do not give additional treatment for multiple myeloma.

206. Dr. Xiang also explained that, any estimate of life expectancy for a patient with multiple myeloma depends on many factors, including but not limited to the disease itself, responsiveness to treatment, other health conditions, and social support, and is based on the doctor's prior experience treating all patients, not one particular patient.

207. If a patient asks for a specific number of years' prognosis, Dr. Xiang generally gives a ballpark answer, as a result. He has no specific recollection of discussing with Mr. Howard and his family such a prognosis.

### G. Other Witnesses' Testimony

208. The Court also heard from the following: Teresa Howard, Russell Howard, Sr., and Fred Beard. These witnesses testified primarily as to events in which Mr. Howard engaged during his life and the impact that Mr. Howard had on their lives. These witnesses also testified as to the pain and suffering they observed Mr. Howard experience in the days leading to his death. This testimony bears primarily on the issue damages, an issue this Court does not reach for the following reasons. As a result, the Court makes no specific findings of fact regarding the testimony of these witnesses at this time.

## II.     Applicable Medical Malpractice Law

209.     To succeed on an action for medical injury under the FTCA prosecuted in substance under the Arkansas Medical Malpractice Act, Ms. Howard must prove the applicable standard of care and a deviation therefrom, unless the asserted negligence is a matter of common knowledge. Ark. Code Ann. §16-114-206(a)(1)-(3).

210.     Under Arkansas law, "expert testimony is required only when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge, when the applicable standard of care is not a matter of common knowledge, and when the jury must have the assistance of experts to decide the issue of negligence." *Haase v. Starnes*, 915 S.W.2d 675, 677-78 (Ark. 1996).

211.     Under Arkansas law, in treating a patient, the Hospital nurses and staff must possess and apply with reasonable care the degree of skill and learning ordinarily possessed and used by members of his or her profession in good standing, engaged in the same type of service in the locality in which he or she practices, or in a similar locality. *See* Ark. Model Jury Inst., Civil AMI 1501 (2018). A failure to meet this standard is negligence. *Id.* In determining the degree of skill and learning the law requires and in deciding whether the Hospital nurses and staff applied the degree of skill and learning which the law require, unless the asserted negligence is a matter of common knowledge, the finder of fact may consider only the expert testimony provided by the qualified medical experts. *See id.*

212.     The trial court has broad discretion to determine whether one qualifies as an expert. *Phillips v. Clark*, 759 S.W.2d 207, 210 (Ark. 1988). The Arkansas Supreme Court has ruled that, under the Arkansas Medical Malpractice Act, the locality rule is the standard of care in Arkansas; the Arkansas Supreme Court has declined to adopt the use of a national standard. *Plymate v.*

*Martinelli*, 2013 Ark. 194, at 5, 2013 WL 1932918, at *3 (Ark. 2013) (expert testified as to national

standard, but not as to the standard of care in Rogers, Arkansas; directed verdict for defense).

213.    The applicable Arkansas statute provides in relevant part:

(a) In any action for medical injury, when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge, the plaintiff shall have the burden of proving:

(1) By means of expert testimony provided only by a medical care provider of the same specialty as the defendant, the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or specialty in the locality in which he or she practices or in a similar locality;

(2) By means of expert testimony only by a medical care provider of the same specialty as the defendant, that the medical care provider failed to act in accordance with that standard; and

(3) By means of expert testimony provided only by a qualified medical expert that as a proximate result thereof the injured person suffered injuries that would not otherwise have occurred.

*Id.*; *see also Broussard v. St. Edward Mercy Health Systems, Inc.*, 386 S.W.3d 385, 390 (Ark.

2012) (striking language in the statute which required that the expert testimony be "provided only

by a medical care provider of the same specialty as the defendant" and upholding the remaining

language of the statute).

214.    Under the statute, "medical care provider" includes, in pertinent part, a "nurse . . .

lawfully providing professional medical care or services."  Ark. Code Ann. §16-114-201(2).

215.    Under the statute, "medical injury" or "injury" is defined as "any adverse

consequences arising out of or sustained in the course of the professional services being rendered

by a medical care provider to a patient or resident, whether resulting from negligence, error, or

omission in the performance of such services."  Ark. Code Ann. §16-114-201(3).

216. The Arkansas Supreme Court has determined that "in order to constitute a 'medical injury' under the Medical Malpractice Act, the injury must be the result of (1) a professional service, (2) a doctor's treatment or order, or (3) a matter of medical science." *Paulino v. QHG of Springdale, Inc.*, 386 S.W.3d 462, 467 (Ark. 2012).

217. Proximate causation is an essential element for a cause of action in negligence. *Clark v. Ridgeway*, 914 S.W.2d 745, 750 (Ark. 1996). Proximate cause is that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred. *Wal–Mart Stores, Inc. v. Kilgore*, 148 S.W.3d 754, 757-58 (Ark. Ct. App. 2004).

218. The Arkansas Supreme Court has also held that the Arkansas Medical Malpractice statute implements the traditional standard that, but for the tortfeasor's negligence, the plaintiff's injury or death would not have occurred. *Ford v. St. Paul Fire & Marine Ins. Co.*, 5 S.W.3d 460, 462-63 (Ark. 1999). Possibilities are not enough. *Id.*; *Flentje v. First Nat'l Bank of Wynne*, 11 S.W.3d 531 (Ark. 2000). Vague and conclusory statements that defendant did not conform to the standard of care do not meet the burden. *Fryar v. Touchstone Physical Therapy, Inc.*, 229 S.W.3d 7, 13 (Ark. 2006).

219. There must be evidence that would tend to eliminate other causes that may fairly arise from the evidence such that the fact finder not be left to speculation and conjecture in deciding between two equally probable possibilities. *St. Paul Fire & Marine Ins. Co. v. Brady*, 891 S.W.2d 351, 353-54 (Ark. 1995).

220. Therefore, a plaintiff's proof of causation must be more than speculation or conjecture. *Arthur v. Zearley*, 992 S.W.2d 67, 73 (Ark. 1999). It must be such that reasonable persons might conclude that it is more probable than not that an event was caused by the defendant.

*Id.*  Proximate cause may be shown from circumstantial evidence, and such evidence is sufficient to show proximate cause if the facts proved are of such a nature and are so connected and related to each other that the conclusion may be fairly inferred.  *Id.*

221.   In general tort cases, Arkansas law recognizes the precept known as the "eggshell plaintiff" rule.  According to the Arkansas Supreme Court, "[s]imply stated, the rule embraces the principles that a tortfeasor must accept a plaintiff as he finds him and may not escape or reduce damages by highlighting the injured party's susceptibility to injury."  *Primm v. U.S. Fid. & Guar. Ins. Corp.*, 922 S.W.2d 319, 321-22 (Ark. 1996) (citing *Benn v. Thomas,* 512 N.W.2d 537 (Iowa 1994); *Hoffman v. Schafer,* 815 P.2d 971 (Colo. App. 1991) *aff'd Schafer v. Hoffman,* 831 P.2d 897 (1992); *Casey v. Fredrickson Motor Express Corp.,* 387 S.E.2d 177 (N.C. Ct. App. 1990); *Prosser and Keeton on the Law of Torts* § 43, p. 292 (5th ed. 1984)).

222.   Arkansas Model Civil Jury Instruction 2203 addresses the eggshell plaintiff rule.  It states that a fact finder "should consider the full extent of any injury sustained, even though the degree of injury is found by [the fact finder] to have proximately resulted from the aggravation of a [condition] that already existed and that predisposed [the plaintiff] to injury to a greater extent than another person."  Ark. Model Jury Inst., Civil AMI 2203 (2018).  The model instruction also states that the fact finder "may not award [him] damages for any [element of damage] which [he] would have suffered even though the accident had not occurred."  *Id.*

223.   Arkansas courts have not explicitly ruled on the applicability of an eggshell plaintiff instruction in medical malpractice cases.  *See, e.g., Bockman v. Butler*, 288 S.W.2d 597, 599 (Ark. 1956) (determining that a physician who committed malpractice is not chargeable for pain, suffering, or anguish that arouse because of the original ailment but is chargeable only for the pain, suffering, anguish, and expenses that naturally follow from the malpractice) (*Bockman II*), *appeal*

*after remand from Bockman v. Butler*, 271 S.W.2d 918 (Ark. 1954) (instructing the jury that the plaintiffs had the burden of proving that the defendant's negligence "was the proximate cause of the unnecessary and prolonged suffering, if any" of plaintiff; no appeal challenged this portion of the instruction) (*Bockman I*).

224.    The Arkansas Supreme Court has held that expert opinions by medical care providers are to be stated within a reasonable degree of medical certainty. *Young v. Gastro-Intestinal Ctr., Inc.*, 205 S.W.3d 741, 745 (Ark. 2005); *Ford*, 5 S.W.3d at 462-63; *Montgomery v. Butler*, 834 S.W.2d 148, 154 (Ark. 1992); *Aetna Casualty & Surety Co. v. Pilcher*, 424 S.W.2d 181, 185 (Ark. 1968).

225.    This Court acknowledges that, during a bench trial, the Court is responsible for determining witnesses' credibility and resolving conflicts in the testimony. *See Wright v. St. Vincent Health System*, 730 F.3d 732, 739 (8th Cir. 2013).

### III.    Alleged Negligent Nursing Care

226.    Ms. Howard alleges that the negligence of Hospital nurses and staff was the proximate cause of Mr. Howard's injuries and death.  It is undisputed that Nurse Haynes and Nurse Kaplon are both Registered Nurses who were lawfully providing professional medical care to Mr. Howard.  The Court finds that Ms. Howard has satisfied through her allegations the "medical care provider" requirement under the Arkansas Medical Malpractice Act.

227.    Other courts have found that the "medical injury" requirement of the Arkansas Medical Malpractice Act is met when a patient sustains injuries from a fall while under the care of a nurse. *See Mandarich v. United States*, Case No. 4:12CV00553 JM, 2014 WL 12576787, at *2 (E.D. Ark. Oct. 16, 2014) (holding that plaintiff sustained a medical injury when he fell under the

care of nurses while in a hospital and subsequently died); *Sexton v. St. Paul Fire & Marine Ins. Co.*, 631 S.W.2d 270, 363 (Ark. 1982) (holding the same).

228.    Based on the record before the Court, Mr. Howard sustained a "medical injury" pursuant to the Arkansas Medical Malpractice Act after falling from the bedside commode on February 16, 2015.

229.    Other courts, when examining facts similar to the present case, have held that expert testimony is required to prove plaintiff's case. *See Mandarich*, 2014 WL 12576787, at *2 (holding that plaintiff was required to present expert testimony to prove negligence where plaintiff fell from a hospital bed while under the care of a nurse); *Sexton*, 631 S.W.2d at 363 (holding that plaintiff was required to present expert testimony to prove negligence where plaintiff was injured and died after falling from a hospital bed when a doctor authorized the use of a restraint but allowed the nurses to make the final decision on the use of the restraint).

230.    The Court finds that the standard of care required to protect Mr. Howard from injury given his physical condition at the time of his fall is not a matter of common knowledge and must be established through expert testimony from a health care provider. Therefore, Ms. Howard is required to present expert testimony to prove her claim of medical negligence as it relates to the nursing care Mr. Howard received.

231.    Ms. Howard presented Ms. Scott to testify as an expert on the standard of nursing care in Little Rock, Arkansas. Ms. Scott has experience working at Baptist Hospital in Little Rock, Arkansas, and testified to the standard of care in the locality where the injury occurred, Little Rock, Arkansas. The Government presented Ms. Langster to testify as an expert on the standard of nursing care. Ms. Langster currently works at UAMS in Little Rock, Arkansas, and also testified to the standard of care in Little Rock, Arkansas. According to the trial testimony of both Ms. Scott

and Ms. Langster, they both reviewed the record in this case and were able to offer opinions regarding the standard of care for nurses involved in this case. Therefore, the Court credits the expert testimony of both Ms. Scott and Ms. Langster regarding the standard of care in this case.

232. The Court gives more weight to the testimony of Ms. Scott and Ms. Langster regarding the standard of care for nursing than to the testimony offered by Dr. Huffman. Even though Dr. Huffman has experience managing nurses, Dr. Huffman did not demonstrate that he was familiar with the degree of skill and learning ordinarily possessed and used by nurses and hospital staff in good standing, engaged in the same type of practice or specialty in Little Rock, Arkansas, or in a similar locality, as is required under the Arkansas Medical Malpractice Act.

**A.      Alleged Breaches During And In Regard To The Fall**

233. Ms. Howard argues that the Hospital nurses and staff breached the standard of care because they allowed Mr. Howard to use the bedside commode, did not have a hand on Mr. Howard while he was using the bedside commode, and were not standing directly in front of Mr. Howard in order to catch him if he fell from the commode.

234. In the amended complaint, Ms. Howard further argues that the Hospital nurses and staff breached the standard of care by not using restraints when Mr. Howard used the bedside commode; not having Mr. Howard wear a helmet; not placing a fall pad on the floor next to his bed; not implementing a bed alarm; and not having regular nursing checks for bathroom needs. The Court examines each argument in turn.

235. For the following reasons, the Court finds that Ms. Howard has failed to show, by a preponderance of the evidence, that the Hospital nurses and staff breached the standard of nursing care with respect to Mr. Howard.

## 1. Use Of Bedside Commode

236.     Ms. Howard first argues that the nurses breached the duty of care by allowing Mr. Howard to use the bedside commode instead of a bedside urinal.

237.     According to Ms. Howard, when Nurse Haynes came into Mr. Howard's room on February 16, 2015, to assist with the bedside commode, Mr. Howard sat up on the bed, before falling back down onto the bed, and commented that it looked like the ocean was going by.  Based on these facts, Ms. Howard argues that Mr. Howard was too dizzy and weak to use the bedside commode, and the nurses should have instead helped him use the bedside urinal, which is more appropriate for patients who are a fall risk.  Ms. Scott also testified on direct examination that, based on Ms. Howard's testimony, the nurses should have assisted Mr. Howard in using the bedside urinal because he was not in an appropriate condition to use the bedside commode.

238.     The testimony of Nurse Haynes and the deposition of Nurse Kaplon do not support Ms. Howard's description of the events that occurred on February 16, 2015, leading up to Mr. Howard sitting on the bedside commode.

239.     According to the testimony of Nurse Haynes, Mr. Howard sat up from the hospital bed without a problem and told her that he could stand and that he did not feel dizzy.  Nurse Haynes observed that Mr. Howard did not appear to be dizzy or weak.  Nurse Haynes also observed that Mr. Howard's speech was clear, appropriate, and coherent.

240.     According to Nurse Kaplon, when Mr. Howard sat up in the bed, he did not appear lightheaded or confused, and he did not slur his speech.  When asked if he was ready to stand up, Mr. Howard said that he could stand up.  Nurse Kaplon further stated that she always asks patients if they are ready to stand before they try to stand up.

241. Further, based on the progress note from Nurse Gillman that was written a few hours before Mr. Howard fell from the bedside commode, Mr. Howard was able to use the bedside urinal successfully, repositioned himself without difficulty, and denied feeling dizzy at that time.

242. There is also testimony and the nursing note entry from Nurse Gillman that, at approximately 4:15 a.m., Ms. Howard went to the nurses' desk and told the nurse that Ms. Howard had just put Mr. Howard in the bathroom and that she did not have time to use the call light to alert the nurses for assistance before she did that. Def.'s Trial Ex. 1B, at 773. The nurse who then entered the room with Ms. Howard found Mr. Howard barefoot and sitting on the toilet in the bathroom where Ms. Howard had placed him and left him alone. *Id.*

243. The Court acknowledges that evidence indicates that Mr. Howard told the nurses that he felt dizzy after taking antibiotics and shots to the stomach. There is no record evidence that Mr. Howard received Vancomycin on the morning of February 16, 2017. At around 9:00 a.m. on February 16, 2015, Mr. Howard would have been finishing an IV infusion of the antibiotic Cefepime.

244. According to the trial testimony of Ms. Scott, Cefepime can cause dizziness or imbalance. According to the trial testimony of Dr. Xiang, Cefepime can cause dizziness or imbalance but that is not common. According to the trial testimony of Dr. Loftus, he has never seen any dizziness caused from Cefepime.

245. Even though Mr. Howard had complained in the past about feeling dizzy after taking antibiotics, and several witnesses testified at trial that dizziness can be a side effect of Cefepime, weighing all of the evidence and the credibility of the witnesses, the Court determines that the greater weight of the evidence refutes that Mr. Howard was dizzy on February 16, 2015, at approximately 9:00 a.m. when he asked to use and moved himself to the bedside commode.

246.     Ms. Howard testified that Mr. Howard fell over on the bed after the nurses had him sit up to use the bedside commode, said that he saw water moving, and that she told the nurses Mr. Howard was having another weak spell. However, the testimony of Nurse Haynes, the deposition of Nurse Kaplon, and the notes taken after Mr. Howard's fall do not indicate that he was dizzy or weak before the nurses transferred him to the bedside commode, nor do they support Ms. Howard's claim about what she alleges Mr. Howard said about moving water.

247.     In addition, both Nurse Haynes and Nurse Kaplon testified that Mr. Howard did not appear dizzy or weak and told them himself that he could stand up to use the bedside commode. Nurse Kaplon further testified that she always asks patients if they are ready to stand up before having them stand and that Mr. Howard was also asked if he was ready to stand.

248.     No witness disputes that Mr. Howard stood and pivoted, moving himself to the bedside commode that day with minimal assistance during the transfer.

249.     Based on the record evidence before the Court, weighing all of the evidence and the credibility of the witnesses, even though Mr. Howard was under Fall Protocol, the Court determines that it was not a breach of the standard of care for the nurses to allow Mr. Howard to use the bedside commode.

### 2.     Attentiveness And Hands On While On Bedside Commode

250.     Ms. Howard also argues that the nurses breached the standard of care by not placing a hand on Mr. Howard while he was on the bedside commode and by not having at least one nurse stand directly in front of Mr. Howard while he was on the bedside commode.

251.     According to the trial testimony of Ms. Scott on direct examination, at least one of the two nurses who were assisting Mr. Howard should have had a hand touching him while he was on the bedside commode in order to steady him and to help catch him, if he were to fall. Ms. Scott

further stated that at least one of the nurses should have been standing directly in front of Mr. Howard while he was on the commode in order to catch him or break his fall. According to Ms. Scott, the failure of Nurse Haynes and Nurse Kaplon to have a hand on Mr. Howard and to stand directly in front of him was a breach of the standard of care.

252.     In response, Ms. Langster testified that the nurses did not breach the standard of care because it is not within the standard of care for a nurse to place a hand on a patient while on the bedside commode under circumstances similar to those presented in this case. Ms. Langster, who works at UAMS, located on the same campus as the Hospital, testified that she does not teach nurses to place a hand on a patient while they are sitting on the bedside commode. Ms. Langster testified that the standard of care for nurses includes giving the patient some degree of privacy while they are using a bedside commode, which does not include placing a hand on them while they are in such a private situation.

253.     Ms. Langster further testified that the record reflects that Nurse Haynes was standing in front of the opening of the bedside commode and within an arm's length of Mr. Howard, which is within the standard of care.

254.     According to the record in this case, neither Nurse Haynes nor Nurse Kaplon placed a hand on Mr. Howard while he was seated on the bedside commode.

255.     According to Ms. Howard, once Mr. Howard was seated on the bedside commode, Nurse Haynes was standing in front of him, then turned halfway around to the hospital bed to pick up an IV bag, and began hooking up the IV bag to the tubing located near the head of the hospital bed. According to Ms. Howard, Nurse Kaplon was standing at Mr. Howard's side while he was sitting on the bedside commode.

256. According to Nurse Haynes, while Mr. Howard was on the bedside commode, she was standing beside him, in front of the opening of the commode, and she was no farther than an arm's length away from Mr. Howard because the small space next to the bed did not allow her to be any farther away from Mr. Howard.

257. According to Nurse Kaplon, Nurse Haynes was standing in front of Mr. Howard, while giving him enough room for privacy, although she estimated that length to be anywhere from two to four feet away.

258. Neither of the nurses testified that, while Mr. Howard was on the bedside commode, Nurse Haynes picked up an IV bag from the bed and was hooking it up to the tubing at the head of the bed.

259. According to both nurses, Nurse Kaplon was standing behind the bedside commode while Mr. Howard was seated on the commode.

260. Both nurses also testified that they were conversing with Mr. Howard, actively engaged in conversation with him, while he was seated on the bedside commode.

261. Based on the record before it, weighing all of the evidence and the credibility of the witnesses, the Court does not find Ms. Howard's description of the bedside commode fall credible.

262. First, according to Ms. Howard, Nurse Haynes entered the room with an IV bag for Mr. Howard. The record shows, on February 16, 2015, that Mr. Howard was prescribed an IV infusion of both Cefepime and Vancomycin, each a one-hour infusion, every 12 hours. On February 14 and 15, 2015, Mr. Howard received IV infusions of Cefepime and Vancomycin simultaneously, every 12 hours. On February 16, 2015, at 8:05 a.m., Nurse Haynes administered the Cefepime infusion and placed an order with the pharmacy for Vancomycin. Mr. Howard was not prescribed any other IV medication at that time.

263.     Besides Ms. Howard's testimony, other record evidence does not show that Nurse Haynes was bringing the Vancomycin to Mr. Howard at around 9:00 a.m. on February 16, 2015. The record evidence only shows that Nurse Haynes ordered the Vancomycin.  Instead, the record evidence shows that Mr. Howard would have completed the Cefepime IV infusion at around 9:00 a.m.

264.     Nurse Haynes also testified that she would have unhooked Mr. Howard from his IV before transferring him to the bedside commode because the IV was not long enough, even though she does not specifically remember unhooking Mr. Howard's IV.

265.     Second, according to Ms. Howard, after Mr. Howard fell from the bedside commode, she moved the commode out of the way and straddled Mr. Howard.  She further testified that, as she straddled him, he mouthed the word "no" when she asked if he could talk.  Ms. Howard testified that she then told the nurses that they needed to call the code team because Mr. Howard's eyes rolled back into his head.

266.     Based on the record evidence, both Nurse Haynes and Nurse Kaplon were closer to Mr. Howard, compared to Ms. Howard.  According to the testimony of both nurses, right after Mr. Howard fell, they moved him and began CPR.  Based on the record, the area between the hospital bed and the wall was a small space.  Therefore, the record does not support Ms. Howard's recollection or testimony that she was able to get to Mr. Howard first, straddle Mr. Howard, and tell the nurses to call the code team.  Instead, based on the testimony of all witnesses regarding the orientation of the room, the placement of each individual in the room, and the sequence of events, the Court determines it is more likely than not that either one of the nurses or both would have checked Mr. Howard and administered CPR immediately after his fall.

267.    Because the factual testimony offered by Ms. Howard regarding the alleged events is not supported by other record evidence, the Court is reluctant to rely on Ms. Howard's recollection regarding Mr. Howard's fall from the bedside commode.

268.    Regardless, even if the Court credits her recollection and testimony, Ms. Howard's testimony is that Nurse Haynes was in front of Mr. Howard and turned halfway around, hooking up the IV, when Mr. Howard fell from the bedside commode.

269.    Even though Nurse Haynes and Nurse Kaplon do not agree about precisely where Nurse Hayne was while Mr. Howard was on the bedside commode, both nurses testified that Nurse Haynes was standing in front of the opening of the commode and between an arm's reach and four feet from Mr. Howard.

270.    Ms. Howard and Nurse Kaplon recall that Nurse Kaplon was positioned either on side of or behind Mr. Howard while he was seated on the commode.

271.    All witnesses present in the room who testified, therefore, agree that at least one nurse was standing next to Mr. Howard or in front of him while he was on the bedside commode, even if the nurses did not have a hand touching him.

272.    During the trial testimony of Nurse Haynes on cross examination, she became confused regarding the placement of the bedside commode relative to Mr. Howard and his hospital bed.  However, the Court does not find that this confusion discredits Nurse Haynes' overall testimony regarding the events that occurred that day.

273.    Based on the record evidence and testimony taken as a whole, weighing all of the evidence and the credibility of the witnesses, the Court finds that the Hospital nurses and staff did not breach the standard of care regarding their position relative to Mr. Howard while he was on the bedside commode and how attentive they were to his needs.

274.     Specifically, even though Mr. Howard was a known high fall risk, and on several prior occasions felt dizzy after taking antibiotics, the nurses did not breach the standard of care by not having a hand on Mr. Howard while he used the bedside commode because the nurses remained physically close to him and attentive to him.  Before he transferred to the bedside commode, the nurses were satisfied that he was able to use the bedside commode instead of the bedside urinal. Further, the Court does not find that the Hospital nurses and staff breached the standard of care by failing to stand directly in front of Mr. Howard in order to catch him, if he were to fall from the bedside commode.  All witnesses' testimony is consistent that Nurse Haynes and Nurse Kaplon were standing next to Mr. Howard or within a few feet in front of Mr. Howard while he was on the bedside commode.  The record also shows that the nurses were talking to Mr. Howard and attentive to him throughout the entire process.  Finally, the record shows that, at the time he was placed on the beside commode, Mr. Howard was able to stand and use the bedside commode, while the nurses gave him a sense of privacy to do so.

275.     Weighing all of the evidence and the credibility of the witnesses, the Court determines that Ms. Howard has failed to show by a preponderance of the evidence that the Hospital nurses and staff breached the standard of care by not having a hand on Mr. Howard while on the bedside commode or by not being attentive to his needs while on the bedside commode.

### 3.     Restraints

276.     Ms. Howard also challenges in her amended complaint the Hospital's failure to use restraints.

277.     Regarding restraints as a fall precaution, according to the trial testimony of Ms. Scott on cross examination, in her opinion, Mr. Howard was not a candidate for any type of restraint while he was in Hospital in February 2015.  Ms. Scott also acknowledged that a restraint

requires a doctor's order. Based on this testimony, the Court determines that Ms. Howard has failed to show by a preponderance of the evidence that the Hospital nurses and staff breached the standard of care by not placing restraints on Mr. Howard.

### 4.    Helmet

278.    Ms. Howard challenges the Hospital's failure to use a helmet. The record evidence shows that Mr. Howard did not wear a helmet while he was at the Hospital.

279.    Regarding helmets as a fall precaution, Nurse Haynes testified on direct examination that helmets are used more for patients who have dementia or live in the community living center.

280.    Ms. Langster testified that helmets are typically used on patients who have suffered a brain injury or similar injury.

281.    Ms. Scott did not testify regarding the use of helmets as a fall precaution.

282.    For these reasons, the Court finds that the Hospital nurses and staff did not breach the standard of care in this instance by not having Mr. Howard wear a helmet.

### 5.    Fall Pad

283.    The record evidence shows that a fall pad was not placed on the floor of Mr. Howard's room. Ms. Howard challenges whether this met the applicable standard of care.

284.    Regarding the use of a fall pad, according to Ms. Scott, the nurses could have used a fall pad as a fall precaution for Mr. Howard. Ms. Scott testified that the fall pads are effective with a lot of people. However, Ms. Scott acknowledged that a fall pad can create a tripping hazard because the lipped surface rolls up on itself easily.

285.    Further, Ms. Scott conceded on cross examination that she did not have enough information to make a determination as to whether the standard of care was violated when a fall

pad was not placed in Mr. Howard's room. She testified that she was not criticizing the nurses for not putting a floor pad in Mr. Howard's room.

286.    According to the trial testimony of Ms. Langster, floor pads are used for patients who have weakness or confusion or where a patient is prone to fall out of bed when no one else is in the room, which was not evidenced by Mr. Howard's medical record. Ms. Langster further testified that a bedside commode cannot be safely placed on top of a fall pad because the fall pad makes the commode unsteady.

287.    According to the trial testimony of Nurse Haynes on direct examination, she did not place a fall pad by Mr. Howard's bed because it would have made the bedside commode unsteady, which would not have been safe. Nurse Haynes further testified that fall pads are typically used for patients who crawl out of bed.

288.    Weighing all of the evidence and the credibility of the witnesses, the Court finds that the Hospital nurses and staff did not breach the standard of care in this instance by not placing a fall pad for Mr. Howard.

### 6.    Bed Alarm

289.    Ms. Howard also challenges the Hospital's failure to use a bed alarm.

290.    According to Nurse Haynes, bed alarms are used for patients who need help getting out of bed but get out of bed without first calling for assistance. The bed alarms sense when a person is shifting his or her weight to stand up or crawl out of bed; the bed alarms make a loud alarm sound. Mr. Howard's bed alarm was not turned on during his time at Hospital.

291.    Ms. Langster explained that bed alarms are used for patients who try to get out of bed or crawl out of bed on their own but need assistance, which was not the case with Mr. Howard.

292.    Nurse Scott did not testify regarding a bed alarm for Mr. Howard.

293.     Weighing all of the evidence and the credibility of the witnesses, the Court finds that the Hospital nurses and staff did not breach the standard of care in this instance by not having the bed alarm in place for Mr. Howard.

### 7.     Checks On Mr. Howard

294.     Finally, Ms. Howard challenges whether the Hospital nurses and staff met the standard of care by having sufficient regular nursing checks for bathroom needs.

295.     Mr. Howard was in bed one, which is directly across from the nurses' station.

296.     The record evidence shows that the Hospital nurses and staff responded to Mr. Howards' requests for assistance.  In the progress note written by Nurse Gillman hours before Mr. Howard fell, she wrote to continue to monitor Mr. Howard.

297.     There is no record evidence that a request for assistance went unanswered at any time before Mr. Howard's use of the bedside commode or that this alleged failure caused or contributed to this incident.  Therefore, the Court finds that the Hospital nurses and staff did not breach the standard of care regarding how frequently they checked on Mr. Howard.

### B.     Nursing Care After The February 16, 2015, Fall

298.     Ms. Scott also testified that a breach of the standard of care occurred when Mr. Howard was moved after he fell from the bedside commode on February 16, 2015.  According to the trial testimony of Ms. Scott, the nurses should have used the "log rolling" technique to turn Mr. Howard over on his back, in order to reduce the risk of aggravating Mr. Howard's injury.

299.     The Court notes that, in its prior Order, the Court limited Ms. Howard to claims regarding the alleged conduct of "staff employees/nurses" and limited actionable conduct to that which occurred on February 16, 2015, only (Dkt. No. 57, at 3).

300.     Ms. Howard does not allege in her complaint or amended complaint that there was a breach of the standard of care regarding how the nurses handled Mr. Howard after he fell from the bedside commode (Dkt. Nos. 1, ¶¶ 13, 16-17; 45, ¶ 1).

301.     Further, Ms. Scott acknowledged that, in her deposition given in this case, she did not mention any criticism of the technique used to turn Mr. Howard over on his back.

302.     Because this issue was not properly raised under the FTCA nor raised by Ms. Scott in her deposition as a criticism or alleged breach of the standard of care, the Court will not address the standard of care or the alleged breach of that standard regarding the nurses' actions to turn Mr. Howard over after the fall.

### C.     Analysis Of Proximate Cause

303.     Ms. Howard argues that the Hospital nurses and staff breached the standard of care and thereby proximately caused Mr. Howard's falling from the bedside commode, caused Mr. Howard's injury to his neck, and caused Mr. Howard's death.  As explained, the Court determines that Ms. Howard has failed to show a breach of the standard of care by a preponderance of the evidence.  Even if Ms. Howard were able to show breach, for the following reasons, the Court determines she is unable to establish proximate cause.

304.     As an initial matter, the Court determines that record evidence of Mr. Howard's pre-existing seizure disorder, pre-existing conditions related to his spine and vertebrae, and the brittle bones he experiences due to his multiple myeloma may qualify Mr. Howard as an "eggshell plaintiff" under Arkansas law.  If the rule applies, the Government must accept Mr. Howard as it found him on February 16, 2015, and may not escape or reduce damages by highlighting Mr. Howard's susceptibility to injury, under Arkansas law.  However, Mr. Howard is not entitled to an

award of damages for elements of damage he would have suffered even though the accident had not occurred. Ark. Model Jury Inst., Civil AMI 2203 (2018).

### 1. The February 16, 2015, Fall

305.     Ms. Howard first asserts that the breach of the standard of care by the Hospital nurses and staff was the proximate cause for the injuries that Mr. Howard sustained, specifically the cervical fracture and central cord syndrome.

306.     Ms. Scott testified that, if the nurses had a hand on Mr. Howard or were directly in front of Mr. Howard, the nurses could have caught him or at least slowed his fall to the ground, saving him from injury.

307.     In response, Ms. Langster testified that Mr. Howard could have fallen a different direction or that the nurses could have failed to catch him, even if the nurses had a hand on Mr. Howard while using the bedside commode.

308.     Nurse Haynes testified that she attempted to catch Mr. Howard when he fell from the bedside commode, but she could not reach him in time.

309.     Based on the record before the Court, weighing all of the evidence and the credibility of the witnesses, the Court concludes that Ms. Howard has failed to show by a preponderance of the evidence that, if the nurses had a hand on Mr. Howard or were standing directly in front of him, they more probably than not would have caught him or been able to bring him to the ground slowly in a way that would have prevented his fall from the bedside commode or prevented or lessened any alleged injuries resulting from that fall. Ms. Howard has failed to meet her burden on causation with regard to the alleged failures of Hospital staff and nurses.

## 2.        Injuries From The February 16, 2015, Fall

310.      Ms. Howard further asserts that the injuries Mr. Howard sustained by falling from the bedside commode were the proximate cause of his death.

311.      The Court credits Dr. Huffman's testimony regarding proximate cause, but Dr. Huffman could not state within a reasonable degree of medical certainty that the injuries Mr. Howard sustained from falling off the bedside commode were the "but-for" cause of Mr. Howard's death. Further, Dr. Huffman could not state within a reasonable degree of medical certainty how long Mr. Howard would have lived passed March 14, 2015, but-for the fall from the bedside commode. Dr. Huffman could only state that in his opinion, qualitatively, Mr. Howard would have lived longer but-for the injuries he sustained from falling off the bedside commode.

312.      The Court also credits Dr. Loftus' testimony. The Court finds that Dr. Loftus' testimony shows that Mr. Howard's odontoid fracture was healed after the successful surgery performed by Dr. Kazemi on February 20, 2015.

313.      Further, the medical records indicate that Mr. Howard's central cord syndrome was improving after his surgery at UAMS, and according to Dr. Loftus, Mr. Howard's central cord syndrome would have continued to improve with time to permit the swelling of Mr. Howard's spine to go down and with rehabilitation.

314.      According to Dr. Loftus, Mr. Howard did not die on March 14, 2015, because of the cervical fracture or the central cord syndrome.

315.      Based on the record before the Court, weighing all of the evidence and the credibility of the witnesses, the Court concludes that Ms. Howard has not presented sufficient evidence that, but-for the staff and nurses' alleged breach of the standard of care, Mr. Howard would not have died when he did on March 14, 2015.

### III.     Wrongful Death Claim

316.     Ms. Howard also brings this action under the Arkansas Wrongful Death Statute. For the following reasons, the Court concludes that Ms. Howard cannot recover on this claim either.

317.     The Arkansas Wrongful Death Statute also allows certain enumerated statutory beneficiaries to recover damages for their own individual personal loss. *See* Ark. Code Ann. § 16-62-102(d)(1); Ark. Code Ann. §16-62-102(f)(1).

318.     The Arkansas Wrongful Death Statute states, in pertinent part:

> (a)(1) Whenever the death of a person or an unborn child as defined in § 5-1-102 is caused by a wrongful act, neglect, or default and the act, neglect, or default would have entitled the party injured to maintain an action and recover damages in respect thereof if death had not ensued, then and in every such case, the person or company or corporation that would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person or the unborn child as defined in § 5-1-102 injured, and although the death may have been caused under such circumstances as amount in law to a felony.

Ark. Code Ann. § 16-62-102(a)(1).

319.     The Arkansas Wrongful Death Statute also states that among "[t]he beneficiaries of the action created in this section are:  (1) The surviving spouse . . . ." Ark. Code Ann. § 16-62-102(d)(1).

320.     As Mr. Howard's spouse, Ms. Howard is the proper beneficiary of the wrongful death claim.

321.     This Court has previously held that, when a medical negligence claim is the underlying claim for a wrongful death claim, and the medical negligence claim is dismissed, the wrongful death claim must also be dismissed because the wrongful death claim derives from the medical negligence claim. *Day v. United States*, 865 F.3d 1082 (8th Cir. 2017); *see also Brown v.*

*Pine Bluff Nursing Home*, 199 S.W.3d 45, 48 (Ark. 2004) (holding that "a wrongful death action is derivative in nature from the original tort").

322. For the reasons stated above, the Court finds that Ms. Howard has failed to meet her burden to show that the Hospital nurses and hospital staff breached the standard of care or that the fall Mr. Howard sustained on February 16, 2015, was the proximate cause of his death. Ms. Howard alleges that the medical negligence claim is the underlying claim which constituted the alleged wrongful act for which she brought the wrongful death action on behalf of the statutory beneficiaries. Ark. Code Ann. § 16-62-102(a)(1).

323. Thus, the "original right" of the decedent is not preserved because this Court has found that Ms. Howard failed to meet her burden of proof regarding the medical negligence claim. *See Estate of Hull v. Union Pac. R.R. Co.*, 141 S.W.3d 356, 359 (Ark. 2004) (holding that a settlement of the underlying tort action precluded prosecution under the wrongful death statute).

324. Because Ms. Howard did not meet her burden of proving breach of the standard of care or proximate cause as to her medical negligence claim and because this Court concludes that her wrongful death claim derives from or is based on her medical negligence claim, based on Arkansas case law, this Court finds that the Government is entitled to judgment as a matter of law on Ms. Howard's wrongful death claim.

## IV. Conclusion

For the above reasons, the Court finds that Ms. Howard, executrix of the estate of C.R. Howard, has failed to prove by a preponderance of the evidence her claim for negligence under the FTCA as prosecuted in substance under the Arkansas Medical Malpractice Act. The Court also finds that Ms. Howard has failed to prove her claim under the Arkansas Wrongful Death Act

because it is derivative of her medical negligence claim. The Court dismisses with prejudice Ms. Howard's complaint.

So ordered this the 31st day of March, 2019.

Kristine G. Baker
United States District Judge